Gauvreau vs. The Superior Publishing Co.

GAUVREAU VS. THE SUPERIOR PUBLISHING COMPANY.

*February 4 — March 3, 1885.*

LIBEL. *(1, 2) Imputation of professional ignorance and unskilfulness. (3) Pleading:* colloquium.

1. Where the words employed in a publication stating the conduct of a physician in a particular case only impute to him such ignorance or want of skill as is compatible with the ordinary or general knowledge and skill in the same profession, they are not actionable *per se.* But where the words so employed, taken together, are such as fairly impute.to him gross ignorance and unskilfulness in such matters as men of ordinary knowledge and skill in the profession should know and do, then they necessarily tend to bring such physician into public hatred. ridicule, or professional disrepute, and hence are actionable *per se.*

2. A newspaper article commenting upon a case which, it alleged, had "certain bearings on the public health and safety," after stating matters which, if true, showed that the attending physician had failed to discover the presence of diphtheria until long after he should have done so, continued: " We think it high time that the community should understand the facts in the case, . . . and should suffer no more either by the ignorance or negligence of any of its physicians. Inability to make a diagnosis should not be a sufficient excuse, for the responsibilities of assumed knowledge cannot be avoided by a plea of ignorance." *Held,* that these words were capable of the meaning, ascribed to them in an *innuendo,* " that the plaintiff was ignorant and negligent in his practice, and that he falsely assumed knowledge as such which he did not possess," and were consequently libelous *per se.*

3. Where the complaint alleges that the defendant published of and concerning the plaintiff the article set forth, quoting such article in full, such *colloquium* need not be prefixed to each paragraph of the article, although in the complaint such paragraph is separated from what precedes by an *innuendo.*

APPEAL from the Circuit Court for *Douglas* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

This is an action for libel. The complaint, among other things, alleges that the plaintiff was a physician and surgeon, duly licensed, and in practice as such in Superior, Wisconsin, and as such was called to treat the children of one Frank-

fort, in that town, a short time prior to the publication of the alleged libel; that to injure the plaintiff, and to impoverish his said business and profession, the defendant did, February 21, 1884, in said town, " knowingly, wilfully, unlawfully, wrongfully, and maliciously compose, print, and publish" in its newspaper, "and did cause to be printed and published therein, as aforesaid, the following false, defamatory, scandalous, and libelous article containing the false, libelous, and defamatory words hereinafter set forth, *which were printed and published of and concerning* the plaintiff, in the way of and in respect to said profession and business generally, in treating patients who might call upon him, and in regard to his treatment of said Frankfort's children in particular; that is to say, said libelous words are as follows, to wit:

### "A Serious Case.

"We have received a communication from one of our citizens in which the conduct of *Dr. E. T. Gauvreau* is very severely and bitterly criticised. While it is not pleasant for us to go into the private matters of any of our citizens, still this case has certain bearings on the public health and safety, and as it is a matter of very common talk among our citizens, we feel at liberty to present to our readers a concise statement of the cause of this agitation. On Friday, the 8th of February, a little two year old son of Alex. Frankfort was taken ill, and their family physician, *Dr. Gauvreau*, was called in to prescribe. He informed the family that the little one was teething, and would be all right in a few days. He continued to visit the child regularly, and also continued to maintain the same position. The child continued to grow worse until Wednesday night, when the family became alarmed, at the suggestions of neighbors, and began to lose confidence in the treatment their child was receiving, and another physician, Dr. Murdock, was summoned, who,

after an examination, revealed at once that the child was in an advanced stage of diphtheria, which astonished and exasperated the parents beyond measure. While examining the child's throat, Dr. Murdock made a careful examination of the gums and teeth, to determine whether *Dr. Gauvreau's* first position had any grounds to support it, and found that the child had been recently cutting teeth, but had none troubling it in the least at the time, nor for many days previously. After Dr. Murdock's visit, the family recalled *Dr. Gauvreau,* and the facts in the case were stated to him (about three o'clock Thursday morning), but he stoutly maintained his original position. In the morning he called in Dr. Conan, and he pronounced the case diphtheria. *Dr. Gauvreau* then stated that the diphtheria had manifested itself early in the morning, since his last visit. At noon the next day the child died, and since that time the remaining two of Mr. Frankfort's children have also died.

" We have called on *Dr. Gauvreau,* who admits such of the above facts as relate to himself, and states that up to the time of his visit early Thursday morning he had examined the throat of the sick child and had discovered no indications of diphtheria, and the case, even when he called in Dr. Conan, whom he asked to assist him, at that time was just to be recognized, and that the cases where he has been called have generally proven fatal or not within twenty-four hours; and the fact that the child died about that length of time afterward, he considers as substantiating his position that previous to that time there was no such disease. He states, moreover, that diphtheria is a very hard disease to diagnose, and that it is possible that there may have been lurking germs of the disease in the child's system before he was able to pronounce the nature of the disease definitely. His theory of the contagion is that some of the laborers working in the camps about the town had given the disease to Mr. Frankfort, who had contributed it to the child while

enfeebled by the teeth-cutting, as he has since discovered that there was a certain Swede with diphtheritic sore throat who had been in the habit of calling in to Frankfort's.

"Dr. Murdock stated to us that when he was called on to go to the child he objected strongly to intruding on another physician's patient, and only finally consented at the earnest solicitations of Mr. Frankfort, the father of the child. He stated that the convulsions noticed in the early stage of the child's sickness were due, not to the cutting of teeth, but to the severity of the initiatory fever, which always introduces diphtheria, and which quite commonly occurs in young children. He would not consent to take the case at the last moment, although Mr. Frankfort and his wife insisted upon his doing so, and were quite angry that he did not.

"Dr. Conan, the health physician, when asked in regard to the matter, stated that when he called, the disease was undoubtedly diphtheria, and probably of three or four days' standing; but that he was not able to state when it manifested itself visibly.

"We are not at all influenced by prejudice, as *Dr. Gauvreau* well understands, but we think it high time that the community should understand the facts in the case, after the matter has been talked about so much, and should suffer no more either by the ignorance or negligence of any of its physicians. Inability to make a diagnosis should not be a sufficient excuse, for the responsibilities of assumed knowledge cannot be avoided by a plea of ignorance. [Meaning thereby that the plaintiff was ignorant and negligent in his practice, and that he falsely assumed knowledge as such which he did not possess.]

"As the health report of our state says, in a volume now on file in our office: 'Burke, who murdered his fellow-creatures in order to sell their bodies for dissection, was a Christian and a gentleman in comparison with the medical fiend who connives at the spread of contagious diseases in order to

increase his practice. . It is wicked to conceal from God's little ones the fountains of infectious suffering and death.' [By the last quotation meaning that this plaintiff had connived at the spread of contagious diseases in order to increase his practice, and concealed said disease wilfully.]"

Then follow the usual allegations, to the effect that by means of said premises the plaintiff had been and was greatly prejudiced in his said credit and reputation aforesaid, and brought into public scandal, infamy, and disgrace, and to be suspected of having acted dishonestly and unskilfully in his said business and profession, and to have connived at the spread of contagious diseases to increase his practice; and that he had been greatly injured thereby, and had lost and been deprived of great gains and profits, which would otherwise have been earned and accrued to him in his profession and business, to his damage in the sum of $5,000; wherefore, judgment is demanded for that amount.

The defendant demurred generally to the complaint, and appealed from an order overruling the demurrer.

*L. M. Vilas*, for the appellant.

For the respondent there was a brief by *David E. Roberts*, attorney, with *H. N. Setzer*, of counsel, and the cause was argued orally by *Mr. Roberts*.

CASSODAY, J. Upon this demurrer the allegations of the complaint must be taken as true. This being so, the things alleged to have been published of and concerning the plaintiff, his business and profession, must be regarded as false, and as such knowingly published by the defendant. *Marsh v. Ellsworth*, 36 How. Pr. 532.

The learned counsel for the defendant is undoubtedly correct in claiming "that it is not the office of an innuendo to enlarge the meaning of the words employed in the publication, but merely to point out their application to the facts previously alleged." That rule has frequently received the

sanction of this court. *Bradley v. Cramer*, 59 Wis. 312, 313. As there stated, it is for the judge to decide whether "the publication is capable of the meaning ascribed to it by an innuendo, and for the jury to decide whether such meaning is truly ascribed to it." Upon these principles, it is claimed that the first innuendo does not enlarge the meaning of the words previously employed in the publication, but left it for the court to determine whether such words were capable of the meaning ascribed to them by the innuendo. Not being so enlarged, it is claimed that the words so published simply charged the plaintiff with " ignorance, unskilfulness, or want of care in a particular case or transaction," and not in his profession or practice generally, and hence are not actionable *per se*, within the authority of *Garr v. Selden*, 6 Barb. 416, and *Gunning v. Appleton*, 58 How. Pr. 471.

The case of *Garr v. Selden* was reversed in the court of appeals (4 N. Y. 91) on the ground that the publication was privileged, and hence that it was unnecessary for the defendant to deny the malice, and so nothing was said in that court upon the question here presented. In the court below the proposition above stated was in effect asserted, but the case was decided in that court on the ground that the words published imputed a want of integrity, and hence were actionable *per se*, notwithstanding they were used with reference to one particular transaction, and not with reference to the plaintiff's professional practice generally. The opinion at general term in *Gunning v. Appleton, supra*, seems to be of the same import, but it can hardly be said that the decision was squarely put upon that ground. To the same effect, *Foot v. Brown*, 8 Johns. 64; *Poe v. Mondford*, 1 Cro. Eliz. 620. These last two cases were for slander, and were each expressly disapproved at general term, in *Secor v. Harris*, 18 Barb. 425, where the spoken words, " Doctor S. killed my children; he gave them teaspoonful doses of calomel, and it killed them; they did not live long

after they took it; they died right off — the same day,"—
were held actionable *per se*. That case has been sanctioned
as authority in the following New York cases: *Carroll v.
White*, 33 Barb. 616; *Bergold v. Puchta*, 2 N. Y. Sup. Ct.
532. In support of this, the learned judge, writing the
opinion in *Secor v. Harris*, cites *Sumner v. Utley*, 7 Conn.
257; *Johnson v. Robertson*, 8 Port. 486; *Tutty v. Alewin*, 11
Mod. 221; *Onslow v. Horne*, 3 Wils. 177. In each of these
cases the words spoken were held actionable, although re-
lating to a particular transaction. In the case in Porter the
words were, "He killed the child by giving it too much
calomel." In the case in Modern the words were, "He
killed a patient with physic." See, also, *Southee v. Denny*,
1 Exch. 202; *Edsall v. Russell*, 43 Eng. C. L. 560; *Bishop v.
Latimer*, 4 Law T. 775; *Camp v. Martin*, 23 Conn. 86;
*Bowe v. Rogers*, 50 Wis. 598. In *Edsall v. Russell* the
words spoken were, "He killed my child; it was the saline
injection that did it;" and it was held that the words spoken
imputed to the apothecary " gross ignorance " and " culpable
want of caution."

Since such is the rule in slander, it certainly cannot be less
stringent in libel. A physician is only required to possess
the ordinary knowledge and skill of his profession. He
may possess these, and much more, and yet be unable to ac-
curately diagnose every disease presented, or always foretell
the exact power and effect of medicine or treatment pre-
scribed; but such deficiencies are incident to human imper-
fection. So long, therefore, as the words employed in
stating the conduct of the physician in a particular case,
only impute to him such ignorance or want of skill as is
compatible with the ordinary or general knowledge and
skill in the same profession, they are not actionable *per se*.
But where the words so employed in detailing the action of
the physician in a particular case, taken together, are such

as fairly impute to him gross ignorance and unskilfulness in such matters as men of ordinary knowledge and skill in the profession should know and do, then they necessarily tend to bring such physician into public hatred, contempt, ridicule, or professional disrepute, and hence are actionable *per se*. *Bradley v. Cramer*, 59 Wis. 309. "This seems only another mode," says Mr. Townshend (sec. 194), "of imputing such ignorance as unfits the person for the proper exercise of his art, or with misconduct therein." It then, in effect, conveys the charge of general professional ignorance, incompetency, or want of integrity. *Camp v. Martin*, 23 Conn. 86.

It would seem that each case must depend upon the language employed, and the facts and circumstances to which it is applied. Here the publication is upon the subject of "a serious case," and declares that "*this case* has certain bearings on the *public health and safety*." It, in effect, charges the plaintiff with treating the child that first died for teething, when there was no ground for thinking that it was so troubled, and that he failed to discover the presence of diphtheria, notwithstanding he treated it when that disease existed in an advanced stage, and at a time when it was at once discoverable on examination. The publication continues: "We think it *high time that the community* should understand the facts in the case, after the matter has been talked about so much, and *should suffer no more, either by the ignorance or negligence of any of its physicians. Inability to make a diagnosis should not be a sufficient excuse*, for the responsibilities of *assumed* knowledge cannot be avoided by a plea of ignorance." We think these words capable of the meaning ascribed to them by the innuendo. If they were truly ascribed, a jury might, perhaps, be justified in finding that the public health and safety of the community had already suffered from the ignorance or negligence of

the plaintiff as a physician, or his inability to make a diagnosis, or his assumed knowledge. For these reasons that portion of the libel is held to be libelous *per se.*

As to the words between the innuendoes, it is virtually conceded that they are actionable *per se,* if there is any allegation or colloquium in the complaint connecting them with the plaintiff, or showing that they were part of the publication in question. The colloquium referred to, with the averment that the defendant published of and concerning the plaintiff the article set forth, followed by the article giving a detailed account of the plaintiff's treatment of the children, with the characterization already mentioned, followed by the remaining portion of the article, connected therewith by the words, "as the health report of our state says," seems to sufficiently indicate, not only that what follows was a part of the publication, but a further characterization of the plaintiff's conduct in the transaction detailed. Sec. 2677, R. S.; *Bradley v. Cramer,* 59 Wis. 309.

*By the Court.*— The order of the circuit court is affirmed.